**FILED**

JUL 20 2009

Clerk, U.S. District and Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HECTOR ALCALDE<br>1101 S. Arlington Ridge Road<br>Unit 1102<br>Arlington, Virginia 22202<br><br>and<br><br>KEVIN J. FAY,<br>1101 Ingleside Avenue<br>McLean, Virginia 22101<br><br>Plaintiffs,<br><br>v.<br><br>BUCHANAN INGERSOLL & ROONEY,<br>P.C.<br>1700 K Street, N.W.<br>Suite 300<br>Washington, D.C. 20006<br><br>and<br><br>LOUIS H. DIAMOND,<br>5335 Wisconsin Avenue, N.W.<br>Suite 440<br>Washington, D.C. 20015<br><br>Defendants. | CIVIL ACTION NO.<br>_____<br><br><br><br><br><br><br><br>Case: 1:09-cv-01341<br>Assigned To : Kessler, Gladys<br>Assign. Date : 7/20/2009<br>Description: General Civil<br><br>JURY ACTION |

## COMPLAINT

Plaintiffs Hector Alcalde and Kevin J. Fay, by counsel, bring this Complaint against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond, and in support thereof allege the following:

### PARTIES

1.      Plaintiff Hector Alcalde ("Mr. Alcalde") is an adult individual residing at 1101 S.

Arlington Ridge Road, Unit 1102, Arlington, Virginia. At all times relevant hereto, Mr. Alcalde was the Chairman and a director and shareholder in the business known as Alcalde & Fay, Ltd. ("A&F"), located at 2111 Wilson Boulevard, 8th Floor, Arlington, Virginia.

2. Plaintiff Kevin J. Fay ("Mr. Fay") is an adult individual residing at 1101 Ingleside Avenue, McLean, Virginia. At all times relevant hereto, Mr. Fay was the President and a director and shareholder of A&F.

3. Defendant Buchanan Ingersoll & Rooney, P.C. is a professional corporation organized under the laws of the Commonwealth of Pennsylvania with its principal office located at One Oxford Center, 20th Floor, 301 Grant Street, Pittsburgh, Pennsylvania. Some time after January 1, 2000, the Washington, DC law firm of Silverstein and Mullens, P.L.L.C., then located at 1776 K Street, N.W., Washington, DC ("S and M") was merged into Buchanan Ingersoll & Rooney, P.C., with Buchanan Ingersoll & Rooney, P.C. as the surviving entity and legal successor to S and M. Buchanan Ingersoll & Rooney, P.C. and S and M are referred to collectively herein as "Buchanan Ingersoll." Buchanan Ingersoll maintains an office in the District of Columbia located at 1700 K Street, NW, Suite 300, Washington, DC. Buchanan Ingersoll represented A&F and Messrs. Alcalde and Fay in connection with a series of related transactions referred to herein as the "A&F ESOP Transactions." On information and belief, all services performed by Buchanan Ingersoll in connection with the A&F ESOP Transactions were performed by professionals based in the Washington, DC office of the firm.

4. During the time period of the A&F ESOP Transactions, defendant Louis H. Diamond ("Mr. Diamond"), an attorney licensed to practice law in the District of Columbia, was a partner in S and M and, following the merger, a shareholder in Buchanan Ingersoll & Rooney, P.C., and Buchanan Ingersoll is legally responsible for the professional services and advice provided to Messrs. Alcalde and Fay by Mr. Diamond.

5. Mr. Diamond is an adult individual residing at 6104 Davenport Terrace, Bethesda, Maryland. During the time period of the A&F ESOP Transactions, Mr. Diamond was resident S and M's Washington DC office and then in Buchanan Ingersoll's Washington, DC office. Mr. Diamond

was responsible for S and M's and then Buchanan Ingersoll's provision of professional services to A&F and Messrs. Alcalde and Fay in connection with the A&F ESOP Transactions and all related matters. On information and belief, Mr. Diamond ceased to be associated with Buchanan Ingersoll in or about 2006 and Mr. Diamond now maintains an office in the District of Columbia located at 5335 Wisconsin Avenue, NW, Suite 440, Washington, DC.

6. At all times relevant hereto, Mr. Diamond was the agent of S and M and/or its legal successor, Buchanan Ingersoll & Rooney, P.C., acting on its behalf, in providing the professional services described herein.

## JURISDICTION AND VENUE

7. This action is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §2201(a), seeking a declaration of the rights and legal relations of the parties with regard to certain professional services provided by Mr. Diamond and Buchannan Ingersoll to Messrs. Alcalde and Fay arising out of the A&F ESOP Transactions.

8. Jurisdiction of this Court is based on diversity of citizenship pursuant to 28 U.S.C. §1332(a). The amount in controversy for Mr. Alcalde exceeds $75,000, exclusive of interest and costs. The amount in controversy for Mr. Fay exceeds $75,000, exclusive of interest and costs.

9. Venue lies in this District because the acts complained of occurred in this District and both defendants maintain offices in this District.

## THE A&F ESOP TRANSACTIONS

10. From 1999 until 2006, Mr. Diamond and Buchanan Ingersoll represented A&F and Messrs. Alcalde and Fay in all legal and business matters relating to the A&F ESOP Transactions.

11. At all times relevant hereto, Mr. Diamond held himself out as a leading national expert with regard to the creation and operation of employee stock ownership plans and the corporate, pension and tax transactions by which such plans are established and come to own employer stock. Countless items of marketing materials prepared by Buchanan Ingersoll touted Mr. Diamond's expertise in this regard. Mr. Diamond is, indeed, a well known practitioner in this

relatively esoteric field of tax, pension and corporate law.

12. On or about 1998, Messrs. Alcalde and Fay and A&F retained Mr. Diamond and Buchanan Ingersoll to represent them in connection with all of the following in a series of related transactions (the "A&F ESOP Transactions"):

a. The establishment and tax qualification of the Alcalde & Fay, Ltd. Employee Stock Ownership Plan, an employee benefit plan (the "Plan") qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder (the "Code") and the Alcalde & Fay, Ltd. Employee Stock Ownership Trust (the "Trust"), which forms a part of the Plan and is a trust exempt from taxation under Section 501(a) of the Code (the Plan and the Trust are together referred to as the "ESOP"). The professional services relating to this work are purely legal in nature.

b. The sale by Mr. Alcalde of a block of his A&F stock to the ESOP, in exchange for a $4.0 million note from the Trust. In the employee stock ownership plan community, analyzing and designing a transaction utilizing notes to the sellers from the employee stock ownership trust is a fairly common form of financing. The professional services relating to this work are often referred to as "feasibility and design."

c. The sale by Mr. Fay of a block of his A&F stock to the ESOP, in exchange for a $1.0 million note from the Trust.

d. Obtaining favorable tax treatment for Messrs. Alcalde and Fay, via a deferral of capital gains tax, with regard to the sale of their stock in A&F to the Trust, pursuant to Code Section 1042. Code Section 1042 permits an open-ended deferral of capital gains tax in circumstances when the sale to the employee stock ownership plan is accompanied by the purchase and holding of "qualified replacement property," as that term is defined in Code Section 1042. Code Section 1042 treatment, as described herein, was an essential element of the A&F ESOP Transactions. Messrs. Alcalde

and Fay would not have entered into the A&F ESOP Transactions without receiving favorable tax treatment under Code Section 1042.

e. The purchase of "qualified replacement property." Under Code Section 1042, a deferral of capital gains tax is only available if the taxpayer purchases certain types of investment assets within a specific period of time. The deferral of capital gains tax ceases when the "qualified replacement property" is disposed of, so the selection, treatment and retention of "qualified replacement property" is crucial in order to allow sellers to employee stock ownership plans to defer capital gains tax for extended periods of time. When combined with estate planning, in fact, the capital gains tax may not ever need to be paid. In the employee stock ownership plan community, the structuring of a transaction to take advantage of Code Section 1042 and to defer capital gains for the longest period possible is referred to as obtaining a "1042 Rollover."

f. The entry into a margin loan agreement between Mr. Alcalde and Morgan Stanley Dean Witter ("Morgan Stanley") whereby Mr. Alcalde borrowed sufficient funds to enable him to purchase the required "qualified replacement property." In this regard, it was essential that entering into the margin loan transaction not be deemed a disposition of the "qualified replacement property" or the deferral of capital gains tax would be lost to the taxpayer. The collateral for the Morgan Stanley margin loan was Mr. Alcalde's "qualified replacement property" – $4.0 million worth of floating rate notes issued by Bank of America (the "FRNs"). Like all margin loans, the Morgan Stanley arrangement exposed Mr. Alcalde to potential margin calls based on the value of the FRNs and other factors. Mr. Diamond introduced Morgan Stanley to Mr. Alcalde and recommended that he use their services for the margin loan.

g. The entry into a margin loan agreement between Mr. Fay and Morgan Stanley whereby Mr. Fay borrowed sufficient funds to enable him to purchase the required

"qualified replacement property." The collateral for the Morgan Stanley margin loan was Mr. Fay's "qualified replacement property" – $1.0 million worth of FRNs issued by Bank of America. Mr. Diamond introduced Morgan Stanley to Mr. Fay and recommended that he use their services for the margin loan.

    h.    The replacement of Morgan Stanley as the lender to Messrs. Alcalde and Fay by entities referred to as "Derivium" in a transaction referred to herein as the "Derivium Transaction." Mr. Diamond introduced Messrs. Alcalde and Fay to Derivium and recommended that they enter into the Derivium Transaction.

13.    Mr. Diamond's and Buchanan Ingersoll's representation of A&F and Messrs. Alcalde and Fay in connection with the A&F ESOP Transactions was regular, ongoing and detailed throughout the entire period between 1998 and 2007, and the defendants knew that Messrs. Alcalde and Fay were relying upon them in connection with all aspects of the A&F ESOP Transaction in general and the replacement of Morgan Stanley in the Derivium Transaction in particular.

14.    Buchanan Ingersoll regularly invoiced A&F and received payment from A&F for the professional services that it rendered to A&F and to Messrs. Alcalde and Fay in connection with the A&F ESOP Transaction in general and the replacement of Morgan Stanley in the Derivium Transaction in particular.

## THE REPLACEMENT OF MORGAN STANLEY WITH DERIVIUM

15.    Beginning in at least 2003, Messrs. Alcalde and Fay began expressing dissatisfaction with the margin loan arrangements that had been established with Morgan Stanley. On behalf of himself and Mr. Alcalde, Mr. Fay approached Mr. Diamond and inquired as to whether alternative margin lenders were available who might replace Morgan Stanley on more favorable terms.

16.    At all times during these discussions, Mr. Fay explicitly sought from Mr. Diamond advice as to whether any replacement loan structure would also satisfy the requirements of Code Section 1042, that is, entering into the replacement loan would <u>not</u> be deemed a disposition of the "qualified replacement property" for purposes of Code Section 1042.

17. During consultations and again at a meeting held in Buchanan Ingersoll's Washington, DC office in August 2003, Mr. Diamond recommended that Messrs. Alcalde and Fay enter into a loan transaction with Derivium Capital, LLC ("Derivium") in lieu of the existing margin loan arrangement with Morgan Stanley. The collateral for the new loan transaction would be the FRNs then pledged to Morgan Stanley. Prior to Mr. Diamond introducing Derivium to Mr. Fay, neither Mr. Alcalde or Mr. Fay – or either of their accountants – had ever heard of Derivium.

18. As Mr. Diamond explained Derivium's loan structure, Derivium would procure a lender (Bancroft Ventures, Limited ("Bancroft")) who would make limited recourse loans to Mr. Alcalde and to Mr. Fay in an amount equal to 90% of the face value of the FRNs. Bancroft's sole recourse would be to the collateral for the new loans – the FRNs. Derivium, in turn, would enter into a sophisticated hedging strategy that would permit the higher loan to value ratio of the Bancroft loan (the "Derivium Transaction"). As Mr. Diamond explained it, Morgan Stanley's margin loan structure was less advantageous to Messrs. Alcalde and Fay than the terms of the Derivium Transaction.

19. The Derivium Transaction structure was extremely complicated and difficult for laypersons to understand. Messrs. Alcalde and Fay expressly relied upon Mr. Diamond to ascertain the legal and tax implications of the Derivium Transaction. In response to direct questions about whether the Derivium Transaction would put Messrs. Alcalde's and Fay's Code Section 1042 capital gains tax deferral in jeopardy or whether there were any risks with Derivium, Mr. Diamond responded that the Derivium Transaction would not place the Code Section 1042 capital gains in jeopardy and that there were "no risks."

20. Based solely on the advice of the defendants, in December 2004, Messrs. Alcalde and Fay each entered into the Derivium Transaction. The proceeds from the Derivium Transaction were received by Morgan Stanley in December 2004 and were applied to the repayment of the Morgan Stanley margin loans.

21. Beginning in 2005 and continuing until at least 2007, Messrs. Alcalde and Fay

received regular quarterly account statements and invoices from Bancroft (who later transferred the notes to Optech Limited), which reflected interest earned by them on the FRNs and interest due from them under the terms of the Derivium Transaction. Messrs. Alcalde and Fay dutifully paid those invoices and reported the interest earned and investment interest paid on their federal tax returns for 2005 though 2007.

22. Unbeknownst to Messrs. Alcalde and Fay, and not readily susceptible to discovery by them until November 2008, according to the Internal Revenue Service (the "IRS") in January 2005 Derivium caused the sale of the FRNs that were to be delivered to Bancroft as collateral for the new loans and converted the proceeds to its own benefit. The IRS has subsequently characterized the Derivium Transaction structure as a "Ponzi scheme." Neither Derivium nor Bancroft provided Messrs. Alcalde or Fay with the required tax reporting documents reflecting what the IRS has described as a sale of the FRNs. As a result of these actions by Derivium, Messrs. Alcalde and Fay's FRNs, then valued at $4.0 million and $1.0 million, respectively, was lost to them.

## THE DEFENDANTS' KNOWLEDGE OF DERIVIUM'S FRAUD

23. Also unbeknownst to Messrs. Alcalde and Fay, in September 2002 the California Corporations Commissioner had filed suit against Derivium, Bancroft and a series of related entities. The Complaint filed in People of the State of California, by and Through the California Corporations Commissioner v. Derivium Capital, LLC, et al. (Superior Court, Sacramento County, California, Case No. 02AS05849) (the "California Case") alleged that the Derivium Transaction structure was a disguised sale designed as a loan and that Derivium and the other defendants immediately sold the collateral for the "loans" in order to fund them.

24. The existence of the California Case, and the issues raised therein regarding the use of the Derivium Transaction in connection with the A&F ESOP Transactions were either known to, or readily knowable by, the defendants well before the August 2003 meeting to discuss whether there were any risks associated with Derivium, and well before Messrs. Alcalde and Fay entered into the Derivium Transaction in December 2004.

25. Prior to the revelation in the California Case that Derivium was selling the collateral for its loans, many employee stock ownership plan legal practitioners had openly questioned whether using the Derivium Transaction structure might be characterized by the IRS as a disposition of the "qualified replacement property" for purposes of Code Section 1042. Some practitioners advised their clients not to do business with Derivium, while others expressed reservation and caution about the structure and advised their clients to be cognizant of the risk that the IRS might argue that entering into the Derivium Transaction triggered the capital gains tax that had been deferred when the employee stock ownership plan transaction was entered into. Following the filing of the California Case and some similar cases elsewhere, the questioning of the Derivium Transaction structure by reputable employee stock ownership plan legal practitioners accelerated. All attorneys who were active in the employee stock ownership plan field and the leading trade associations (such as the ESOP Association) either knew, or should have known, of these discussions and concerns.

26. On information and belief, the IRS commenced a formal investigation of Derivium and the Derivium Transaction structure in 2004.

27. In Mr. Diamond's capacity as a member of the ESOP Association's Legislative and Regulatory Committee, he knew or should have known about the professional discussions concerning Derivium.

28. At no time before December 2004 – or at any time since Messrs. Alcalde and Fay entered into the Derivium Transaction – did the defendants advise Messrs. Alcalde and Fay of the existence of the California Case or the increasing doubts within the employee stock ownership plan legal community about the viability of the Derivium Transaction structure under Code Section 1042.

29. By the time Mr. Diamond left Buchanan Ingersoll, Derivium had effectively gone out of business and many taxpayers who had used Derivium in connection with "qualified replacement property" under Code Section 1042 had received notices from the IRS that a capital gain transaction had occurred – and gone unreported by the taxpayer – as of the date of their transaction with Derivium. Despite this enforcement activity – which was well known in the employee stock

ownership plan legal community and some of which involved other clients of the defendants – the defendants did not advise or alert Messrs. Alcalde and Fay of their potential IRS tax problems.

## THE IRS ACTIONS INVOLVING THE PLAINTIFFS

30.  In November 2008, Messrs. Alcalde and Fay separately received "Preliminary Notices" from the IRS stating, in part, that:

> The Internal Revenue Service has information indicating that you may be involved in a "loan" program which may be used for tax avoidance purposes. The "loan" program may be known as … an ESOP/QRP Loan Program. Collateral may extend … to include floating rate notes (FRN's). The "lender" or administrator may be identified as … Derivium Capital LLC … Bancroft Ventures, Ltd. … or Optech Ltd.
>
> It is the government's position that purported loans with Derivium … are in fact sham transactions built into a Ponzi scheme. These disguised sales of stock are fully reportable in the year the purported loans were funded. The substance of a transaction, rather than its form, governs the Federal income tax treatment of the transaction ….
>
> … if you sold your company stock to its employee stock ownership plan (ESOP) and elected Internal Revenue Code Section 1042 non-recognition of the gain, and if your transaction with Derivium involved the qualified replacement property … your transaction is in fact a disguised sale of stock.

Copies of the Preliminary Notices addressed to Messrs. Alcalde and Fay are attached hereto as Exhibits "A" and "B," respectively.

31.  The IRS has taken the position that the Derivium Transaction must be taxed as if it had been a sale. As such, the capital gains tax that Messrs. Alcalde and Fay indefinitely deferred pursuant to Code Section 1042 became, according to the IRS, taxable "in the year the purported loans were funded."

32.  According to Mr. Alcalde's IRS Preliminary Notice, engaging in the Derivium Transaction triggered the following adverse tax consequences for Mr. Alcalde:

|                         |                  |
|-------------------------|------------------|
| Increase in Tax         | $1,240,330.00    |
| Penalty                 | $   248,066.00   |
| Interest (to 12/04/08)  | $   301,026.09   |
| Total                   | $1,789,442.09    |

-10-

33. According to Mr. Fay's IRS Preliminary Notice, engaging in the Derivium Transaction triggered the following adverse tax consequences for Mr. Fay:

|  |  |
|---|---|
| Increase in Tax | $ 305,992.00 |
| Penalty | $ 61,198.40 |
| Interest (to 12/07/08) | $ 74,480.91 |
| Total | $ 441,671.31 |

34. Upon receipt of the Preliminary Notices, Messrs. Alcalde and Fay: (i) jointly engaged special employee stock ownership plan and tax counsel to review the matter and negotiate or litigate with the IRS; (ii) engaged their respective accountants to provide support for the effort described above; and (iii) put the defendants on notice of the IRS' claims and Messrs. Alcalde's and Fay's claims against the defendants. Messrs. Alcalde and Fay tendered the defense of the IRS tax matters to Buchanan Ingersoll, which refused the tender.

35. Messrs. Alcalde and Fay continue to discuss the tax matters with the IRS. It is clear, however, from recent communications with the head of the IRS group in charge of Derivium matters that the IRS believes that Messrs. Alcalde and Fay owe substantial amounts of tax, triggered by their entering into the Derivium Transaction.

36. Messrs. Alcalde and Fay have incurred substantial costs in connection with the IRS tax matters. To date, the professional fees jointly incurred by Messrs. Alcalde and Fay exceed $60.000, and those costs are likely to escalate as the IRS tax matters move to the appeal and/or litigation stage.

37. It is impractical and perhaps impossible for Messrs. Alcalde and Fay to resolve the IRS matters without the obligations of the defendants to them being determined. Messrs. Alcalde and Fay may be otherwise unable financially to contest the IRS tax matters and pay any taxes, penalties and interest that may ultimately be determined to be owed.

## THE DEFENDANTS' DUTIES OF CARE TO THE PLAINTIFFS

38. An attorney who holds himself out as knowledgeable in a complex field of law has a

duty to his clients to remain current and informed regarding relevant legal developments in his field.

39.  An attorney who recommends a particular tax strategy for his clients has a duty to research the law and the facts regarding the potential tax implications of the recommended strategy.

40.  An attorney who is asked by his clients to advise them with regard to potential risks associated with a recommended tax strategy has a duty to research the law and the facts regarding those risks and to provide his clients with all of the relevant information necessary to allow them to make an informed judgment with regard to those risks.

41.  An attorney who has given tax advice to his clients has an ongoing duty to inform his clients when he learns that the IRS has taken a contrary position in similar matters, when the IRS' contrary position might result in the imposition on his clients of substantial taxes, interest and penalties.

42.  An attorney who gave tax advice to his former clients nevertheless has an ongoing duty to inform them when he learns that the IRS has taken a contrary, and adverse, position in similar matters, when the IRS' contrary position might result in the imposition on his former clients of substantial taxes, interest and penalties.

43.  A professional advisor who recommends an investment vehicle or particular form of loan transaction for his clients has a duty to perform a reasonable investigation of the nature of the transaction prior to making the recommendation.

44.  A professional advisor who recommends a particular broker or dealer for an investment vehicle or loan transaction for his clients has a duty to perform a reasonable investigation of the broker or dealer prior to making the recommendation.

## COUNT ONE
### Professional Malpractice – All Defendants

45.  Messrs. Alcalde and Fay incorporate by reference all of the allegations set forth in this Complaint as if repeated here in full.

46.  Buchanan Ingersoll and Mr. Diamond violated the duties of care set forth in this

Complaint and most particularly those set forth in Paragraphs 40 through 44, inclusive, of this Complaint.

47. Buchanan Ingersoll and Mr. Diamond acted in callous and reckless disregard of the rights of Messrs. Alcalde and Fay.

48. As a direct result of the conduct of Buchanan Ingersoll and Mr. Diamond, Messrs. Alcalde and Fay have suffered a significant legally cognizable injury, to wit:

    a. to date they have incurred the costs set forth in Paragraph 36 of this Compliant;

    b. they will incur substantial additional costs in connection with the IRS tax matters;

    c. they have been exposed to perhaps more than $2.0 million in taxes, penalties and interest in connection with the IRS tax matters;

    d. they have lost the value of the FRNs; and

    e. they have been exposed to substantial economic uncertainty and concern which inhibits their ability to conduct their business and personal affairs in a reasonable fashion.

**WHEREFORE,** Plaintiffs Hector Alcalde and Kevin J. Fay, pray for relief as follows:

A. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond jointly and severally, for professional malpractice, in an amount to be determined at trial.

B. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond, jointly and severally, for exemplary damages arising out of the defendants' callousness and recklessness with regards to the rights of the plaintiffs.

C. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond for the costs of suit and such further legal, equitable and remedial relief that this Court deems just and proper.

## COUNT TWO
### Negligence – All Defendants

49. Messrs. Alcalde and Fay incorporate by reference all of the allegations set forth in this Complaint as if repeated here in full.

50. Buchanan Ingersoll and Mr. Diamond violated the duties of care set forth in this Complaint and most particularly those set forth in Paragraphs 43 and 44 of this Complaint.

51. Buchanan Ingersoll and Mr. Diamond acted in callous and reckless disregard of the rights of Messrs. Alcalde and Fay.

52. As a direct result of the conduct of Buchanan Ingersoll and Mr. Diamond, Messrs. Alcalde and Fay have suffered a significant legally cognizable injury, to wit:

   a. to date they have incurred the costs set forth in Paragraph 36 of this Compliant;

   b. they will incur substantial additional costs in connection with the IRS tax matters;

   c. they have been exposed to perhaps more than $2.0 million in taxes, penalties and interest in connection with the IRS tax matters;

   d. they have lost the value of the FRNs; and

   e. they have been exposed to substantial economic uncertainty and concern which inhibits their ability to conduct their business and personal affairs in a reasonable fashion.

**WHEREFORE,** Plaintiffs Hector Alcalde and Kevin J. Fay, pray for relief as follows:

   A. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond for negligence, in an amount to be determined at trial.

   B. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond for exemplary damages arising out of the defendants' callousness and recklessness with regards to the rights of the plaintiffs.

   C. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond, jointly and severally, for the costs of suit

and such further legal, equitable and remedial relief that this Court deems just and proper.

## COUNT THREE
### Declaratory Judgment – All Defendants

53. Messrs. Alcalde and Fay incorporate by reference all of the allegations set forth in this Complaint as if repeated here in full.

54. Buchanan Ingersoll and Mr. Diamond have exposed Messrs. Alcalde and Fay to significant taxes, penalties, interest and costs by reason of the breaches of duty set forth in this Complaint.

55. Buchanan Ingersoll and Mr. Diamond are obligated to indemnify and hold harmless Messrs. Alcalde and Fay from and against all taxes, penalties, interest and costs incurred by the plaintiffs as a result of the conduct of the defendants.

**WHEREFORE,** Plaintiffs Hector Alcalde and Kevin J. Fay, pray for relief as follows:

A. That this Court enter a declaratory judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond requiring that they indemnify and hold plaintiffs harmless from and against taxes, penalties, interest and costs incurred by the plaintiffs in connection with the pending IRS examinations of the plaintiffs' tax returns relating to the A&F ESOP Transaction and the Derivium Transaction.

B. That this Court enter a judgment in favor of plaintiffs and against defendants Buchanan Ingersoll & Rooney, P.C. and Louis H. Diamond for the costs of suit and such further legal, equitable and remedial relief that this Court deems just and proper.

Respectfully submitted:

MILES & STOCKBRIDGE, P.C.

Dated: July 20, 2009.

By: *(signature)*
John E. Prominski, Jr. #356303
1751 Pinnacle Drive, Suite 500
McLean, Virginia 22102
Phone: 703-610-8653
Fax: 703-610-8686

By: *(signature)*
Harvey B. Cohen #149930
1751 Pinnacle Drive, Suite 500
McLean, Virginia 22102
Phone: 703-610-8655
Fax: 703-610-8686

OF COUNSEL:

Steven R. Fischer
STEIKER, FISCHER, EDWARDS & GREENAPPLE, P.C.

10 Shurs Lane, Suite 102
Philadelphia, Pennsylvania 19127
Phone: 215-681-0755
Fax: 610-275-2879

*Attorneys for Plaintiffs Hector Alcalde and Kevin J. Fay*

## JURY DEMAND

Plaintiffs, by counsel, hereby demand a trial by jury on all claims so triable.

_____
Harvey B. Cohen